GEORGE W. ANDERSON v. N. W. TAYLOR et al.

EXECUTION. Levy on realty. Lien. The lien of an execution levied upon realty is confined to the date of the levy, and does not relate to the teste of the execution.

### FROM DAVIDSON.

Appeal from the Chancery Court at Nashville. W. F. COOPER, Ch.

J. C. & J. M. GAUT for Anderson.

M. VAUGHAN for Taylor.

E. H. EWING, Sp. J., delivered the opinion of the court.

On the 19th of August, 1868, W. I. Taylor sold and conveyed to N. W. Taylor a lot and house in Nashville. N. W. Taylor, as the consideration therefor, executed to W. I. Taylor two notes, each for $2,000, and one note for $1,000. A lien was retained on the face of the deed to secure the notes. The two first notes were transferred with the lien to one Bloomsteine, and by him to the complainant Anderson. No one appears before us to assert any claim upon the third note, and it need not, except incidentally, be further mentioned. N. W. Taylor failed to pay his note, and Anderson filed his bill in the chancery court at Nashville to enforce his lien. A decree was made in his favor, and also in favor of Douglass,

the owner of the other note, and the house and lot ordered to be sold. It was sold, and Anderson and Douglass became the purchasers. Before the confirmation of the sale, one Morton filed his petition in the cause to set up his right to the property, and asked to be allowed to be made a defendant and to put in an answer. His petition was allowed, and his answer showed that on the 9th of May, 1868, he recovered a judgment in the circuit court of the United States, at Nashville, against both of the Taylors, for $1,606; that on the 30th of July, 1868, a *fieri facias* was issued thereon, and levied, on the 16th of October, 1868, on the house and lot in question; that the execution was held up by plaintiff's order, one of the Taylor's having in the meantime paid on the judgment some $700; that on the 16th of August, 1869, under a *venditioni exponas*, the house and lot was sold, and Morton became the purchaser, at $1,084.

These are all the facts of the case necessary to elucidate the conclusion at which this court has arrived. The question of fraud in the transfer to Bloomsteine has been abandoned, and it is unnecessary to examine whether the transfer to him was for a pre-existing debt, as that could only be important upon the question of laches on the part of Morton in pursuing his levy.

The sole question necessary to be decided by this court in the view that it has, is this: Did Morton's levy relate to the teste of his execution? If it did not, then his claim fails; and we are of opinion that it did not.

This question is so far new, that there has never been any direct decision upon it in this State. The point is not known ever to have been distinctly made. It would seem a little strange that in the multitude of cases that have probably existed in this State where such a claim, if sustainable, would have given property to a party, the question has not been made. Upon the question in regard to the relation of a levy of an execution upon personal property to its teste, the decisions in our State have been numerous, beginning with the case of *Preston* v. *Surgoine,* Peck's R. That there is no evidence of acquiescence in such a claim in regard to real estate, is too plain to justify a contest upon the other side. It may, however, have been one of those questions that has escaped notice by accident, and comes up now for adjudication for the first time in this State. Without attempting to examine or discuss the cases decided in other States which may seem to sustain the position that a levy of an execution upon land does not relate to the teste, we will examine the question alone upon principle, as developed in the legislative and judicial history of the subjection of lands to the payment of debts in England, North Carolina and Tennessee. It might be unsafe to bring to bear upon it decisions of other States, where legislation and modes of construction may have grown up differing from our own.

In England, the statute of the 13 Edward I., ch. 18, made lands of the debtor subject to be charged for his debts, and the process given for this purpose was the writ of *elegit;* this writ bore also upon the

goods of the debtor. After this, by legal construction judgments of courts of record were held to be a lien on the land, and the lien to be of indefinite duration. The *elegit* was a writ under which the sheriff delivered to the creditor one-half the debtor's lands and the whole of his personal goods (with some small exceptions), to hold until, out of the profits, his debt should be paid: 3 Black. Com., 418. Under this statute in England, construed as above, no question could well arise as to priorities between writs, or between a writ and a conveyance, the judgment settling all controversies as to priorities. Some questions were, however, raised upon the point of the time of delivery of the *elegit* to the sheriff, but decided according to the priority of judgment: See Coke Littleton, 289 B.; 4 Reports, 66 B.; *Tulward's Case*, Carthew, 255, as cited by Judge Peck in *Hickman* v. *Murfree*, Mart. & Yerg. (Cooper's ed.), 409. The *elegit* never had in it the virtue of a lien as to lands; it was a mere authority or license to seize the lands of the debtor and deliver them to the creditor. As to the goods, by construction of the courts, they were held from the teste of the writ, as was the case on writs of *fieri facias*. A *fieri facias*, which, at the passage of the above statute, was leviable only on goods upon which a judgment was not a lien, had this *raison d'etre* for the fiction that the goods should be held from the teste of the writ: Some time was necessary to be given before the actual levy, within which the goods could not be alienated or properly removed, in order that the sheriff might have reasonable time within

which to make it, consistently with the pressure of other business and the ordinary exigences of life. The time thus given took date from the teste of the writ, and this rule was applied to the *elegit* so far as goods were concerned. The *elegit* itself was never a *lien* upon lands. The law being in this situation in England in 1732, 5 Geo. II., ch. 7, sec. 4, was passed, by which lands in the colonies were made liable to be seized and sold for the payment of debts, and the writ of *fieri facias* was made applicable to such seizure and sale. Under this statute (without referring to other cases) it was held by the Supreme Court of Tennessee, in the celebrated case of *Porter's Lessee* v. *Cocke,* Peck's R., 30 (opinion by Brown, J.), that the giving the writ of *fieri facias* and the subjecting lands to seizure and sale, as well as goods and chattels, did not put the lands of the debtor upon the same footing as to liens as the goods and chattels, but that the lien of the judgment (restricted as to time, however, by the act of 1799) remained the same as under the statute of Edward I., above mentioned; and in effect, that in this respect the *elegit* and the *fieri facias* stood upon the same footing after the passage of the act of George II.—that is, that the writs attached to themselves no lien, but were mere licenses or authorities to seize and deliver in the one case, and to seize and sell in the other. They were modes of carrying out another lien, viz., that of the judgment. From the moment of seizure, in either case, the lands were in the grip and custody of the law, which by this closed its hand upon them. It might be said, how-

ever, that this was all very well as a mode of view-
ing these writs while the judgment gave a lien un-
limited as to time, but that when the act of 1799
came, restricting the lien of judgments to one year,
and requiring that a levy and sale complete should
be within this time, there came to be a reason, in
certain contingencies, for a new construction upon the
effect of the *fieri facias.* The land might be seized
at such time in the year of the judgment lien as that
a sale could not be made before its end, and there
might be *bona fide* purchasers, who became such be-
fore the seizure but after the teste of the writ.

Upon what has been already said, it can be read-
ily seen that, upon principle, such a levy could have
no retroactive effect. The restriction of the lien as
to duration of time, could not infuse into the writ
an element which it did not before possess. By con-
struction, however, early after this change in the lien
of the judgment, a power and character may have
been given to this writ which it did not before pos-
sess. It will not do to say that this arose easily
and naturally by analogy to the writ of *fieri facias*
against goods and chattels. This door is effectually
closed by the case of *Porters' Lessee* v. *Cocke.* But,
as the very question now before the court did not
arise in that case, it may be well to go a little
further, and see whether there have been any cases
from which it may be inferred that the courts looked
upon these writs as giving any lien previous to seizure
as to lands. We have already said we know of no
cases directly in point. In the case of *Hickman* v.

*Murfree,* Mart. & Yerg., 35, there is a reference to
the North Carolina lien decision which might be thought
to have a bearing on that case.    Judge Peck says:
"Most of these we have examined," and names sev-
eral.   He then proceeds:  "These cases prove nothing
against the positions we have assumed.    Each case
assumes it as law that an execution binds from the
teste, and that an *alias,* pursued after return of the
first execution, binds from the teste of the first exe-
cution.    Although in one of these cases there is a
*dictum* that a *fieri facias* on the judgment will not
bind from the teste, though, say the judges, had the
*elegit* been sued out, the judgment would have been
a lien, and this because the *elegit* is the process given
by the statute."    These North Carolina cases were
regarded by Judge Peck as having little to do with
the question before him, which he said depended on
a sound construction of our acts of Assembly.    The
question before him was, whether the judgment of a
county court (a court of record) was a lien upon the
land of the debtor in another county.    It had been
closely and tersely argued by those two eminent gen-
tlemen—Francis B. Fogg on the one side, and Wm.
L. Brown on the other, and no allusion had been
made by either to the lien of an execution.

Judge Peck might well say, in 1827 (the case of
*Porter's Lessee* v. *Cocke* having been already decided
in 1823), that these North Carolina decisions had no
bearing on the case before him.    In North Carolina
the course of decision (including the cases referred to
by Judge Peck) was, that the judgment lien did not

Anderson *v.* Taylor.

apply where lands were sold under a *fieri facias,* but
applied only where they were extended under an *elegit.*
In our State, on the contrary, since the case of *Porter*
v. *Cocke,* the contrary doctrine has been held.    Since
the case of *Overton* v. *Perkins,* reported in Mart. &
Yerg., 370, much has been said in our books of the
lien of an execution levied after the expiration of
twelve months from the judgment, or levied so short
a time before the expiration of the twelve months
that there was not time to advertise and sell.    But
this is a lien (if lien it may be called) after the levy,
and when from that time forward the land is in the
possession of the law.    The lien of a judgment in
this State is now, and has been long given by statute
directly; the lien of an execution on goods is given
by construction.    No lien has as yet been given to
an execution, as such, upon lands, either by construc-
tion or otherwise, until the same is levied.    And if
the levy is an act merely in execution of the judg-
ment, as has been already argued, it can have no
retroactive effect.    To suppose two concurrent liens
to exist, one of which extends continuously without
break for a year, and leaves the other from court to
court, without use or scope, and this, too, by con-
struction adopted *ut res magis valeat quam pereat,*
would seem to be wholly unwarrantable.    But this
must be so if the execution, as such, is to have a
lien after the expiration of the year commencing with
its teste, by relation, in case of a levy; such a lien,
extending behind a levy to the teste of the execution,
must be a secret lien, and cannot constitute a *lis*

*pendens* until the levy is made, and so operate as constructive notice. It is at best a fiction of the law, not sanctioned by custom or usage, and now that it is for the first time distinctly presented, it is proper to disregard it. It is obnoxious to all the evils which have been so solicitously guarded against by our registration laws in regard to the lien of judgments.

We are of opinion, then, that the position of Anderson as the purchaser of the notes that were a lien upon the property conveyed by W. I. Taylor to N. W. Taylor, is not affected by the subsequent levy upon and sale of said property under Morton's execution. We are also of opinion that the sale of said property made in this cause, at which Anderson and Douglass became the purchasers, should be confirmed.

The decree of the chancellor is reversed, and a decree will be entered here in accordance with this opinion, and the cause retained here for further proceedings if necessary; and that the costs accrued in the chancery court up to the sale to Anderson and Douglass be paid by the complainant, and the costs after that time by Morton & Jones, his attorneys, and that the costs of this court also be paid by Morton & Jones.